SHARTSIS FRIESE LLP
JOEL ZELDIN (Bar #51874)
jzeldin@sflaw.com
PAUL P. "SKIP" SPAULDING, III (Bar #83922)
sspaulding@sflaw.com
ROBERT CHARLES WARD (Bar #160824)
rward@sflaw.com
ROEY Z. RAHMIL (Bar #273803)
rrahmil@sflaw.com
425 Market Street, Eleventh Floor
San Francisco, CA  94105-2496
Telephone:     (415) 421-6500
Facsimile:     (415) 421-2922

Attorneys for Plaintiff
FEDERATED INDIANS OF GRATON RANCHERIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERATED INDIANS OF GRATON RANCHERIA,<br><br>        Plaintiff,<br><br>        v.<br><br>DOUG BURGUM, Secretary of the United States Department of the Interior; BRYAN MERCIER, Acting Assistant Secretary for Indian Affairs, United States Department of the Interior; TONY DEARMAN, Director of Indian Education, United States Department of the Interior; PHILIP BRISTOL, Acting Director of the Office of Indian Gaming, United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; STEPHANIE CONDUFF, Acting Director of the United States Bureau of Indian Affairs; AMY DUTSCHKE, Regional Director, Pacific Region, United States Bureau of Indian Affairs; and UNITED STATES BUREAU OF INDIAN AFFAIRS,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

By this Complaint for Declaratory and Injunctive Relief ("Complaint"), Plaintiff Federated Indians of Graton Rancheria ("FIGR" or "Tribe") alleges as follows:

**INTRODUCTION**

1. Plaintiff FIGR files this action to challenge a group of arbitrary, capricious and legally inadequate decisions by Defendants U.S. Department of the Interior ("DOI") and Bureau of Indian Affairs ("BIA") on January 13, 2025 to approve taking land into federal trust for gaming for the massive Shiloh Resort and Casino Project ("Project"), which would be located in the ancestral territory of FIGR and other Southern Pomo tribes and in a quiet Sonoma residential neighborhood in the midst of schools, churches and vineyards.  In their rush to approve this project before the change in federal administrations, Defendants have violated the Administrative Procedure Act ("APA"), the Indian Gaming Regulatory Act ("IGRA"), the Indian Reorganization Act ("IRA"), and the National Environmental Policy Act ("NEPA").

2. This litigation involves a trilogy of federal statutes (IGRA, IRA and NEPA) that work together in the Indian tribal gaming context to tightly regulate casinos on Indian lands, to authorize an administrative land into trust process for qualifying Indian tribes, and to require federal agencies to take a "hard look" at the human health and environmental impacts of such projects.  IGRA strikes a careful balance *between* limiting new casinos on Indian lands to protect surrounding communities, existing Indian gaming operations and the public interest *with* promoting tribal economic development, self-sufficiency and sovereignty.   IRA and its implementing regulations establish specific criteria governing the land into trust process.  NEPA requires detailed analyses of environmental issues, cultural resource impacts, and a robust range of project alternatives to guarantee informed agency decision-making and active public participation.  Unfortunately, Defendants "steamrolled" these important statutory protections in their regulatory sprint to approve the Project for the Koi Nation of Northern California ("Koi Nation") regardless of applicable legal requirements.

3. At the outset, this Project was illegally approved in violation of IGRA's general prohibition against Indian gaming on lands acquired after 1988 because the tribal applicant fails to meet the detailed requirements for a "restored lands exception."  The Koi Nation's ancestral

Case No.                                    COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

homeland is approximately 50 road miles and over two mountain ranges away from the Shiloh Site, and neither the applicant nor the Project meet IGRA's requirements to establish an off-reservation gaming complex. This Project represents an unwarranted expansion and distortion of the exceptions to gaming on new Indian lands under IGRA and exemplifies the type of prohibited "reservation shopping" for desirable gaming locations that IGRA was specifically designed to prevent.

4. Not surprisingly, Defendants' proposal to locate this Project on the Shiloh Site has provoked a crescendo of opposition letters from California's Governor (who, among other things, "is concerned by the prospect that the Department might invoke the 'restored lands' exception to support projects that are focused less on restoring the relevant tribes' aboriginal homelands, and more on creating new gaming operations in desirable markets"), the County of Sonoma, the Town of Windsor, many federal Congressional representatives, the four Sonoma County Southern Pomo Indian tribes, and hundreds of local residents. The adverse comments cover a remarkable spectrum of issues including misapplication of the "restored lands exception," failure to follow applicable IGRA and IRA criteria, and many problems in the wholly deficient Final Environmental Impact Statement ("Final EIS").

5. Plaintiff FIGR is a federally recognized Indian tribe comprised of Southern Pomo and Coast Miwok people, and its congressionally recognized territory includes Sonoma and Marin Counties, where it has resided since time immemorial. Many of the Tribe's ancestors' resting places and its irreplaceable cultural resources are located in Sonoma County, and many of the more than 1500 FIGR citizens reside in Sonoma County. The cultural, environmental and economic interests of the Tribe will be significantly and irreversibly adversely affected by Defendants' actions authorizing the land into trust transaction for this gaming Project.

6. The Final EIS for the Project is a fatally flawed document that fails to meet the procedural and substantive requirements of NEPA. Remarkably, the Final EIS fails to evaluate any geographic alternative to the Shiloh Site, including any site within Lake County where the Koi Nation's demonstrated ancestral territory is located, thereby defying well-established NEPA case law requiring analysis of a reasonable range of alternatives. Moreover, even though the immediate

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

Project area has been the site of two of the largest fires in California history in the last eight years, the Final EIS wrongfully concludes that there are no significant wildfire risks in this vulnerable location. Similarly, Defendants' analyses of Project impacts on cultural resources, traffic, water supply, land use, wastewater discharge, air and other environmental resource areas are patently deficient and fail to meet the important "hard look" standard embedded in NEPA.

7. On January 13, 2025, in a blizzard of activity just before the change in presidential administrations, Defendants simultaneously issued (1) a Record of Decision ("ROD") primarily focused on NEPA (but including IGRA and IRA) approving the proposed Project and acquisition of the Shiloh Site in trust for the Koi Nation; and (2) an accompanying Decision Letter which includes an Indian Lands Determination (collectively "Decision Letter") deciding that the Koi Nation may conduct Indian gaming at the Shiloh Site under the restored lands exception of IGRA and approving the acquisition of the Shiloh Site in trust under the IRA. The same day, Defendants signed the acceptance of the land conveyance to take the Shiloh Site into trust.

8. This Complaint contains two claims for relief under IGRA, two claims under IRA, two NEPA claims, and one claim under IGRA, IRA and NEPA, all of which are asserted pursuant to the Administrative Procedure Act ("APA"). The two IGRA claims challenge Defendants' arbitrary and capricious "restored lands exception" determination and challenge the validity of the IGRA regulations on which Defendants' erroneous interpretations of this exception are based. The two IRA claims demonstrate that Defendants violated the Tribe's right to be treated equally through the privileges and immunities afforded tribes under federal law and that Defendants' land into trust decision is arbitrary, capricious and contrary to law. The NEPA claims cover the failures of the Final EIS to analyze a reasonable range of alternatives or to take the requisite hard look at a wide range of environmental impacts. The final claim asserts that all of these decisions are invalid, *ultra vires*, and void *ab initio* because FIGR is informed and believes that the DOI official who signed the decisions lacked valid delegated authority to do so.

9. For these reasons, the Tribe requests that the Court enter appropriate declaratory relief for Defendants' violations of the APA, IGRA, IRA and NEPA, along with a judgment vacating both the Record of Decision and the Decision Letter. The Tribe further requests that the

- 3 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

Court declare that the land into trust transaction has never been effectuated and issue a mandatory injunction ordering the Defendants to remove the Shiloh Site from trust status.

**JURISDICTION AND VENUE**

10.     The Court has subject matter jurisdiction of this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"); Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701, *et seq.* ("IGRA"); Indian Reorganization Act, 25 U.S.C. §§ 5101, *et seq.* ("IRA"); National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"); 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1346 (United States as defendant); and 28 U.S.C. § 1362 (original jurisdiction of civil actions brought by a federally recognized Indian tribe which arise under the laws of the United States).

11.     Since this civil action arises under the laws of the United States and names United States officers and departments as defendants, jurisdiction exists under 28 U.S.C. § 1331.  There is an actual, justiciable controversy between the parties within the meaning of 28 U.S.C. § 2201(a). The Court may grant declaratory, injunctive and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and a substantial part of property that is the subject of this action is situated in this judicial district. Venue is also appropriate in the San Francisco and Oakland Divisions of the Northern District of California pursuant to Civil Local Rule 3-2(c) because this case involves claims for relief arising in Sonoma County.

13.     FIGR filed a Complaint in this Court on November 27, 2024 that challenges earlier final agency action by DOI and BIA for this Project under the National Historic Preservation Act ("NHPA").  *See Federated Indians of Graton Rancheria v. Haaland, et al.*, U.S. District Court for the Northern District of California (Case No. 3:24-cv-08582-RFL).  Specifically, this earlier lawsuit challenged the failures of DOI and BIA to initiate, pursue and complete a critical government-to-government consultation with FIGR required by NHPA Section 106.  This earlier action predated the above-described final agency action decisions under IGRA, IRA and NEPA

- 4 -

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

that occurred on January 13, 2025 that are the subject of the instant case, and they have separate administrative records.  Since these two cases are related, FIGR is filing an administrative motion pursuant to this Court's Civil Local Rules to relate the two cases.

## PARTIES

14.     Plaintiff FIGR is a federally recognized Indian tribe.  It is composed of Southern Pomo and Coast Miwok people, and its reservation is located adjacent to the City of Rohnert Park in Sonoma County, California.   Congress recognized the Tribe's historic and continued connections to its aboriginal territory within Sonoma and Marin Counties in the Graton Rancheria Restoration Act.  P.L. 106-568, 114 Stat. 2868, §§ 1401-08.

15.     Defendant Doug Burgum is now the United States Secretary of the Interior and is sued in his official capacity.  As Secretary, he is responsible for overseeing the implementation of federal actions within the United States Department of the Interior and its agencies, including the Bureau of Indian Affairs, as well as the Department's implementation of and compliance with IGRA, IRA and NEPA.

16.     Plaintiff FIGR is informed and believes, and on that basis alleges, that Defendant Bryan Mercier is the acting Assistant Secretary for Indian Affairs for the U.S. Department of the Interior, and he is sued in his official capacity.  As the Assistant Secretary, he discharges duties of the Secretary with the authority and direct responsibility to strengthen the government-to-government relationship with Indian tribes, exercises Secretarial discretion and leadership over the Bureau of Indian Affairs, and decides requests for off-reservation land into trust acquisitions for gaming purposes. 109 DOI Departmental Manual ("DM") 8.1; Indian Affairs Manual ("IAM") Part 52, Chapter 15, § 1.7.

17.     Defendant Tony Dearman is the Director of the Bureau of Indian Education, United States Department of the Interior and is sued in his official capacity.  On January 13, 2025, he signed both the NEPA Record of Decision and the Decision Letter, which completed Defendants' IGRA, IRA and NEPA processes and approved both the Indian gaming application and the taking of the Shiloh Site into a trust for the Koi Nation.

18.     Plaintiff FIGR is informed and believes, and on that basis alleges, that Defendant

- 5 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

Philip Bristol is the acting Director of the Office of Indian Gaming, U.S. Department of the Interior, and he is sued herein in his official capacity. As Director, he is responsible for advising the Secretary and Assistant Secretary for Indian Affairs on Indian gaming, including the requirements of IGRA, for processing requests to take land into trust for the purpose of gaming, and for determining eligibility of newly acquired lands for gaming. 110 DM 8.4.

19.    Defendant United States Department of the Interior is responsible for the administration of IGRA, IRA and NEPA in its projects and for compliance with all other laws applicable to agencies within the Department of the Interior, including the Bureau of Indian Affairs.

20.    Defendant Stephanie Conduff is the acting Director of the United States Bureau of Indian Affairs and is sued in her official capacity. As Director, she is responsible for overseeing the Bureau's implementation of NEPA, the land into trust requirements and all other statutes, regulations and other laws applicable to the Bureau of Indian Affairs. 230 DM 1.1.

21.    Defendant Amy Dutschke is the Regional Director of the Pacific Region of the Bureau of Indian Affairs, located in Sacramento, California, and is sued in her official capacity. As the Regional Director of this office, she is responsible for complying with Department of the Interior and Bureau of Indian Affairs policy and procedures for fee-to-trust acquisitions, including records management and related responsibilities and processing discretionary off-reservation land-into-trust applications. IAM Part 52, Chapter 15, §§ 1.5, 1.7.

22.    Defendant Bureau of Indian Affairs is a federal agency within the United States Department of the Interior. The Bureau of Indian Affairs is responsible for evaluating land into trust applications, conducting environmental review, and effectuating any acquisition into trust relating to the Koi Nation's application for acquisition in trust by the United States of the Shiloh Site adjacent to the Town of Windsor, Sonoma County, California.

23.    This Complaint is being filed a few weeks after the change in federal administrations, which has resulted in some of the agency officers who took the actions at issue having left their positions or having been replaced with acting or new agency officials. For purposes of the Complaint, FIGR has named the current officers or acting officers of the relevant

- 6 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

agencies, but anticipates that further changes will occur. Since all of these officers are named in their official capacities, FIGR understands that their successors will be automatically substituted as parties pursuant to Federal Rule of Civil Procedure 25(d).

24. The Defendants described in paragraphs 15-23 herein are collectively referred to herein as "Defendants." All of these Defendants and/or their predecessors worked in concert with each other, and as agents of the other Defendants, in connection with the NEPA, IGRA and IRA approvals for the Koi Nation Project. Due to this interrelationship, all of the actions taken by one or more Defendants set forth in this Complaint are attributable to all Defendants.

## STANDING

25. As recognized by Congress and DOI, Plaintiff FIGR has historic and continued connections to its aboriginal territory within Sonoma and Marin Counties, including to the Shiloh Site. The Tribe's ancestors lived in and near Graton, Marshall, Bodega, Tomales, and Sebastopol, California. Graton Restoration Act, 114 Stat. 2868, § 1406. In February 2009, the National Indian Gaming Commission ("NIGC"), which, like BIA, is housed within DOI, found that the Tribe "is composed of Coast Miwok and Southern Pomo groups that in the early 1900s were present in the Tomales and Marshall areas of Marin County and the Bodega and Sebastopol areas of Sonoma County." NIGC, Final Environmental Impact Statement, Graton Rancheria Casino and Hotel Project, p. 1-1. The NIGC found that Sebastopol "was once the site of a large, permanently inhabited Southern Pomo village" and that Southern Pomo villages were located near Windsor, Healdsburg, and Guerneville. NIGC Restored Lands Opinion for Graton Rancheria (Feb. 10, 2009), p. 7.

26. The Tribe and other Southern Pomo tribes[1] in Sonoma County remain inextricably connected to and protective of their culture and history in the area of Windsor and the Shiloh Site in Sonoma County. The Southern Pomo language and culture are distinct from that of other Pomo tribes, such as the Southeastern Pomo Koi Nation, and these linguistic, cultural, and territorial

[1] Four federally recognized Southern Pomo tribes have a demonstrated, aboriginal connection to Sonomo County: FIGR, the Cloverdale Rancheria of Pomo Indians, the Dry Creek Rancheria Band of Pomo Indians, and the Lytton Band of Pomo Indians.

Case No.                COMPLAINT FOR DECLARATORY AND INJUNCTIVE
                                            RELIEF

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

boundaries have persisted over millennia. FIGR, like many tribes in California, was decimated in place as a result of federal and state policies designed to terminate and erase tribes. Nonetheless, the Tribe continues to fight for its sovereignty, its citizens, its ancestors, and its cultural resources. These connections are foundational to the Tribe's identity and continued existence. They breathe life into FIGR's actions and provide meaning to its Tribal citizens, who have survived despite a history of genocide against California Indians. Every day, the Tribe is working to rebuild and revitalize its culture, through language programs, cultural resource protection, and environmental stewardship of its ancestral lands, in order to honor its ancestors and create a meaningful future for its generations to come.

27.     The IGRA, IRA and NEPA violations described in this Complaint have caused and will cause actual injury to FIGR, which is required by its federally approved Constitution to protect its on-reservation and off-reservation cultural patrimony, and to its citizens. These injuries include, without limitation, adverse impacts to (A) the sovereignty of FIGR and the cultural artifacts and ancestral remains located on the Shiloh Site; (B) the environmental values and practices of FIGR relating to its ancestral homelands and as a Tribe whose citizens live in the vicinity of the Shiloh Site, regularly visit the area and appreciate its central role in the Tribe's history, environmental values, wildlife and habitats; and (C) the tribal government's ability to exercise its sovereignty and provide for the welfare of its citizens, which will be directly and adversely impacted by the proposed Project casino gaming operation through decreased revenues and related economic impacts on the Tribe and its citizens.

28.     The Shiloh Site is unambiguously within FIGR's Southern Pomo ancestral territory and the Tribe retains strong connections to this land. This land holds cultural resources of the Southern Pomo people. Pruitt Creek, which runs through this site, was and is part of the Tribe's homeland, a place where Southern Pomo ancestors gathered sedge for basketmaking, and medicine women collected herbs and other plants that have healing qualities. According to the customs and practices of Northern California Indian peoples, if another tribe wanted anything in the Pruitt Creek area, they would ask for permission from the Southern Pomo. These areas tend to contain cultural artifacts and relics left by the Southern Pomo people who used and visited the site.

- 8 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

29.     The Shiloh Site contains at least one and likely more historic sites, and a significant number of cultural resources and artifacts, including most probably human remains, which must now be evaluated and protected in consultation with FIGR.

30.     Tribal citizens have also walked the Shiloh Site (when accessible), the adjacent Esposti Park, and Shiloh Ranch Regional Park just to the east of the Project Site for generations. These visits reaffirm Tribal citizens' stewardship of the land and understanding of the land's spiritual importance and the need to protect it for future generations.  These lands and waterways are integral to the Tribe's origin stories and cultural practices and represent the interconnected lifeways of the Tribe's ancestors.

31.     The Tribe has invested significant resources into its environmental and cultural resources programs, which protect and preserve these and other Southern Pomo ancestral lands for future generations and for the broader community through environmental education, expanding parks and open spaces that protect sacred sites, and through implementation of environmental sustainability plans, policies, and procedures.

32.     The above-described harms are directly traceable to and being caused by Defendants' disregard of the central goals, prescribed procedures, required determinations, and environmental protections of IGRA, IRA and NEPA.  In their rush to proceed with the land into trust decision, Defendants have violated IGRA, IRA and NEPA and failed to meet their trust responsibility to FIGR as required by law, which has adversely affected FIGR's sovereignty and its cultural and environmental values and threatens its economic interests.

33.     The injuries to FIGR and its citizens would be redressed by the relief sought in this Complaint, which would vacate Defendants' decisions at issue and would require Defendants to conduct legally adequate NEPA, IGRA and IRA processes before making these decisions.

## STATUTORY BACKGROUND

### A.     Indian Gaming Regulatory Act

34.     In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Supreme Court held that a state lacks authority to regulate tribal gaming on Indian lands.  In response, Congress passed IGRA as a compromise balancing state, federal, and tribal interests.  25

- 9 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

U.S.C. § 2701 *et seq.*; 18 U.S.C. §§ 1166-1168. *See In re Indian Gaming Related Cases*, 331 F.3d 1094, 1096 (9th Cir. 2003). IGRA was adopted to promote tribal economic development, self-sufficiency, and strong tribal governments. 25 U.S.C. § 2702; *Redding Rancheria v. Jewell*, 776 F.3d 706 (9th Cir. 2015). It provides a statutory basis for the operation and regulation of tribal gaming activities on Indian lands, which includes lands within an Indian reservation and those held in trust by the United States for the benefit of a tribe. 25 U.S.C. §§ 2702; 2703(5).

35. IGRA generally prohibits a tribe from gaming on Indian lands taken into trust after IGRA's effective date of October 17, 1988. 25 U.S.C. § 2719(a); *City of Roseville v. Norton*, 348 F.3d 1020, 1024 (D.C. Cir. 2003). However, there are two pertinent exceptions. A tribe may game on land taken into trust after IGRA's enactment if the DOI Secretary determines that gaming would be in the best interest of the tribe and not detrimental to the surrounding community ("Secretarial two-part" exception) and the governor of the state concurs. 25 U.S.C. § 2719(b)(1)(A). Defendants could have pursued this exception, but did not. A tribe may also game on land if acquisition of that land qualifies as "the restoration of lands for an Indian tribe that is restored to Federal recognition," which is known as the "restored lands exception." 25 U.S.C. § 2719(b)(1)(B)(iii); 25 C.F.R. § 292.7; *Redding Rancheria*, 776 F.3d at 710. IGRA's statutory language does not define a restoration of lands. *City of Roseville*, 348 F.3d at 1024.

36. In 2008, DOI promulgated regulations interpreting and implementing IGRA's Secretarial two-part and restored lands exceptions. 25 C.F.R. § 292.1; *see Redding Rancheria*, 776 F.3d at 710. In order to game on post-1988 Indian lands under the restored lands exception, a tribe must show that it was previously recognized, lost its government-to-government relationship, and was restored to federal recognition and that the newly acquired lands proposed for gaming constitute restored lands. 25 C.F.R. §§ 292.7; 292.11. To constitute restored lands, the tribe must demonstrate "'modern,' 'historical,' and 'temporal' connections to the [t]ribe's original land." *Redding Rancheria*, 776 F.3d at 710 (quoting 25 C.F.R. § 292.12). Defendants have interpreted the historical component to require a "significant historical connection," which is defined to mean the land is either within the tribe's last reservation under a ratified or unratified treaty, or there is historical documentation of "the tribe's villages, burial grounds, occupancy or subsistence use in

- 10 -

Case No.
COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

the vicinity of the land."  25 C.F.R. §§ 292.2, 292.12.

37.    The DOI Secretary, in applying the restored lands exception, must "ensure that tribes do not take advantage of the exception to expand gaming operations unduly and to the detriment of other tribes' gaming operations."  *Redding Rancheria*, 776 F.3d at 711.  A cultural connection is a necessary component of demonstrating a significant historical connection.  73 Fed. Reg. 29354, 29360.  A significant historical connection also requires "something more than evidence that a tribe merely passed through a particular area."  73 Fed. Reg. at 29366.  In contrast, the Secretarial two-part exception does not require a tribe to have ancestral ties or a significant historical connection to the newly acquired land, and the regulations recognize that this could detrimentally impact the traditional connections of a tribe that does have a significant historical connection.  25 C.F.R. §§ 292.13, 292.18(f); 73 Fed. Reg. at 29368.

### B.    Indian Reorganization Act

38.    The Indian Reorganization Act of 1934 ("IRA") was enacted to "conserve and develop Indian lands and resources," among other purposes, so that Indian tribes could "assume a greater degree of self-government, both politically and economically."  48 Stat. 984, codified at 25 U.S.C. §§ 5101, *et seq.*; *Morton v. Mancari*, 417 U.S. 535, 542 (1974).  The cornerstone of this legislation is Section 5, now codified at 25 U.S.C. § 5108, which authorizes the DOI Secretary to acquire lands in trust "for the purpose of providing land for Indians."  This mechanism, commonly referred to as the "land into trust" process, was Congress' attempt to reverse the decades-long loss of tribal lands via the prior federal policy of allotment that had forced the sale and privatization of tribal land, leading to the loss of two-thirds of the tribal landholdings that remained after centuries of dispossession.  *See Readjustment of Indian Affairs: Hearings on H.R. 7902 Before the H. Comm. On Indian Affairs*, 73d Cong. 15-18 (Feb. 22, 1934).  Upon acquisition by the United States in trust for the beneficiary tribe, the land becomes "Indian country," which has a special jurisdictional status pursuant to federal law generally.  *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123, 125 (1993).

39.    DOI promulgated regulations to govern the IRA land into trust process at 25 C.F.R.

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

- 11 -

Case No.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

Part 151.[2]  Upon a tribe's application for land into trust, DOI must complete a number of steps, including conducting environmental review pursuant to NEPA and issuing notice of the application to the state and local governments.  25 C.F.R. §§ 151.10, 151.11.  As part of the public notice process, DOI solicits written comments on the acquisition's "potential impacts on regulatory jurisdiction, real property taxes, and special assessments."  25 C.F.R. §§ 151.10, 151.11(c).  DOI is further required to consider "[j]urisdictional problems and potential conflicts of land use which may arise" if the land is acquired in trust.  25 C.F.R. §§ 151.10(j), 151.11(a).

40.     For trust applications involving parcels located "outside of and noncontiguous to the tribe's reservation" (which applies to this Project), DOI must also consider "[t]he location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation."  25 C.F.R. § 151.11(b).  Moreover, "as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" while "giv[ing] greater weight to the concerns raised" by local governments.  25 C.F.R. § 151.11(b), (d).

### C.     National Environmental Policy Act

41.     NEPA is our country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1.  One key purpose is "to promote efforts which will prevent or eliminate damage to the environment…"  42 U.S.C. § 4321.  The Council on Environmental Quality has promulgated regulations to implement NEPA, which are "binding on all federal agencies."  40 C.F.R. § 1500.3.  *See* 40 C.F.R. §§ 1500.1, *et seq*.  DOI has also published regulations implementing NEPA, which are codified at 43 C.F.R. §§ 46.10 to 46.450.

42.     In the ROD, BIA states that it is aware of the November 12, 2024 federal court decision in *Marin Audubon Society v. Federal Aviation Administration,* No. 23-1067 (D.C. Cir.

---

[2]/ Substantial revisions of these regulations went into effect on January 11, 2024.  However, newly revised 25 C.F.R. § 151.17 provides that fee-to-trust applications pending as of the effective date will continue to be processed under the prior version unless the applicant requests in writing to proceed under the new regulations.  Because the Koi Nation application was processed pursuant to the regulations in place prior to January 11, 2024, all citations to 25 C.F.R. Part 151 herein are to that prior version (i.e. the 2023 regulations).

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

- 12 -

Case No.                COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

Nov. 12, 2024) regarding the NEPA regulations promulgated by the President's Council on Environmental Quality ("CEQ"). In response to this development, BIA states: "To the extent a court may conclude that the CEQ regulations implementing NEPA are not judicially enforceable or binding on this agency action, the BIA has nonetheless elected to follow those regulations at 40 CFR Parts 1500-1508, in addition to the Department of the Interior's procedures/regulations implementing NEPA at 43 CFR Part 46, and the BIA NEPA Guidebook (59 Indian Affairs Manual 3-H) to meet the agency's obligations under NEPA, 42 U.S.C. §§ 4321 et seq." ROD, at 3, fn. 1.

43. NEPA requires all agencies of the federal government to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is referred to as an Environmental Impact Statement ("EIS"), which must describe (1) "reasonably foreseeable environmental effects of the proposed agency action"; (2) "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal"; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity" and (5) "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented" *Id*.

44. The alternatives section is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. NEPA and its implementing regulations require the careful development and discussion of alternatives. 42 U.S.C. §§ 4332(2)(C)(iii); 40 C.F.R. § 1502.10(e). In fact, NEPA requires an exceptionally robust discussion of alternatives in which the EIS must "[r]igorously explore and objectively evaluate reasonable alternatives," "discuss each alternative considered in detail," and "include reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14.

45. NEPA also compels federal agencies to "take a 'hard look' at environmental consequences" of their proposed actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S.

- 13 -

332, 350 (1989). This "hard look" is essential to ensure that an EIS serves its public "informational role" by assuring the public that the agency "has indeed considered environmental concerns in its decision making process" and is "'provid[ing] a springboard for public comment' in the agency decision making process itself." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004). "An adequate EIS is essential to informed agency decision-making and informed public participation, without which the environmental objectives of NEPA cannot be achieved." *South Fork Band Council of Western Shoshone v. Dep't of Interior*, 588 F.3d 718, 725 (9th Cir. 2009).

### D.    Administrative Procedure Act

46.    The APA provides a right of judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Plaintiff FIGR has suffered legal wrong and been adversely affected and aggrieved by reason of Defendants' actions described in this Complaint.

47.    The APA provides that a reviewing court "shall…compel agency action unlawfully withheld or unreasonably delayed.…" 5 U.S.C. § 706(1).

48.    The APA also directs that the reviewing court "shall" hold unlawful and set aside agency actions, findings and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). An agency action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

49.    All of the claims for relief in this Complaint are asserted pursuant to the APA.

### E.    Declaratory Judgment Act

50.    This Court has the power to declare the rights and other legal relations of any interested party in a case of actual controversy within its jurisdiction. 28 U.S.C. § 2201(a). A court may also provide "[f]urther necessary or proper relief based on a declaratory judgment…."

28 U.S.C. § 2202.

51.    Plaintiff is entitled to declaratory relief by the Court in which it determines the rights and duties of FIGR and Defendants with respect to the IGRA, IRA, NEPA and APA violations set forth in the seven claims for relief in this Complaint pursuant to 28 U.S.C. §§ 2201-2202.  A dispute has arisen between FIGR, on the one hand, and Defendants, on the other hand, regarding their respective rights and obligations relating to the ROD, Decision Letter and/or the Final EIS in each of these claims.  FIGR is informed and believes, and on that basis alleges, that Defendants disagree with FIGR's positions on each of these claims for relief and documents.

## PROJECT BACKGROUND AND APPROVAL PROCESSES

### A.    Koi Nation Project Context

52.    The Koi Nation, formerly known as the Lower Lake Rancheria, is a federally recognized Indian tribe of Southeastern Pomo people with its homeland in Lake County, California.  The Koi Nation is named for Koi, a village located on an island in the southeastern portion of Clear Lake in Lake County, California.  *The Southeastern Pomo Koi Nation are a historically, linguistically and culturally distinct people from the Southern Pomo of FIGR and other Sonoma County tribes.*

53.    Koi Nation applied to Defendants for a land into trust transfer of the Shiloh Site under the IRA, which is a NEPA "project" whereby Defendants would take title to the 68.6-acre Shiloh Site located immediately adjacent to the Town of Windsor in Sonoma County, California, and hold this land in trust for the Koi Nation for purposes of a casino gaming project.  The development would include a casino with a capacity of over 10,000 people, a hotel, ballroom/meeting space, event center, spa, over 5,000 parking spaces, extensive water and wastewater facilities and pipelines, and other infrastructure, all in the ancestral territory of FIGR and other Southern Pomo tribes.  The Shiloh Site is located in Southern Pomo territory and is approximately 50 driving miles from Koi Nation's ancestral territory and across two mountain ranges.

54.    The Project would be built in the midst of quiet residential neighborhoods near schools, a church and vineyards.  The Shiloh Site is located in unincorporated Sonoma County and

- 15 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

is zoned for agriculture.  It is part of Sonoma County's "Community Separator" areas, which are "voter-approved districts that were created to preserve open space, retain rural visual character, limit new development in scale and intensity, and specifically avoid commercial development." Under these local and state land use restrictions, the Project would be prohibited in this location.

55.    The Project required three major approvals by Defendants.  The first approval was the issuance of a Final EIS under NEPA.  The Final EIS, which formally concluded the environmental review process for the Project, identified the proposed Project as the Preferred Alternative under NEPA.  The Notice of Availability of the Final EIS was published by the U.S Environmental Protection Agency on November 22, 2024.  89 Fed. Reg. 92681, 92713 (November 22, 2024).  NEPA's implementing regulations prescribe a 30-day waiting period after completion of the Final EIS before a ROD (which is the final step in the NEPA process) is issued.

56.    The second needed approval was a decision by Defendants that the Project meets federal requirements for the United States to acquire title to the Shiloh Site in trust for the Koi Nation pursuant to the IRA and its implementing regulations.  25 U.S.C. § 5108; 25 C.F.R. Part 151.

57.    The third required approval was that DOI must determine that the Koi Nation's request to conduct gaming on the Shiloh Site satisfies the "restored lands exception" to the general prohibition against gaming on Indian lands acquired after 1988 contained in IGRA and its implementing regulations.  25 U.S.C. §§ 2701, *et seq*.; 25 C.F.R. Part 292.

58.    On January 13, 2025, Defendants signed and issued the ROD and Decision Letter granting all three required approvals for the Project to move forward.  On the same day, Defendants also accepted title to the Shiloh Site in trust for the Koi Nation.

**B.    The Indian Gaming Regulatory Act Process**

59.    Defendants' consideration of whether tribal gaming may be conducted on land acquired in trust for a tribe after IGRA's effective date is subject to the regulations at 25 C.F.R. 292.  The regulations do not require Defendants to provide notice that a tribe has submitted a request for a restored lands determination and Defendants do not provide a formal public notice or comment period.  Defendants' practice is to consider all comments submitted during its

- 16 -

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

unannounced review of a request for the restored lands exception to allow gaming on a proposed site.

60.    Plaintiff FIGR is informed and believes, and on that basis alleges, that Koi Nation submitted a request to Defendants for a restored lands determination on September 13, 2021 and supplemented that request on March 2, 2023 and July 5, 2023.  FIGR submitted comment letters to Defendants regarding the Koi Nation's restored lands request on January 31, 2024, November 22, 2024, and December 20, 2024. These letters included extensive comments demonstrating that the Koi Nation lacks a significant historical connection to the Shiloh Site and that this tribal applicant does not meet the criteria for a positive restored lands determination.

61.    FIGR also submitted to Defendants expert comments from former National Indian Gaming Commission Chairman Jonodev Chaudhuri regarding the "restoration of lands" under IGRA and the "significant historical connection" under the regulations.  He also cautioned Defendants against reinterpreting these terms contrary to the plain language and intent of IGRA, to Defendants' regulations, and to past practice.  The Tribe also submitted numerous requests for government-to-government consultation with Defendants regarding Defendants' consideration of this restored lands request and the Part 292 regulations, all to no avail.

62.    On January 13, 2025, Defendants issued the Decision Letter and ROD that concluded the IGRA and IRA processes.  In the Decision Letter, Defendants approved the land into trust application for the Shiloh Site pursuant to the IRA and determined that the Shiloh Site is eligible for gaming by the Koi Nation pursuant to the restored lands exception in IGRA.  The issuance of the Decision Letter and ROD constitute "final agency action" under the APA.

### C.    The Indian Reorganization Act Process

63.    The regulations at 25 C.F.R. Part 151 govern the process for the federal government to acquire land to hold in trust for a beneficiary tribe.  In evaluating an off-reservation land acquisition, the Secretary provides notice and a 30-day comment period for state and local governments with regulatory jurisdiction over the land. While the regulations do not provide a formal notice and comment period for tribes or the public, Defendants' practice has been to consider all tribal comments submitted during its review of an application for land into trust

- 17 -

acquisition of off-reservation lands. Additionally, when adopting the latest version of the Part 151 regulations, Defendants reaffirmed this position by stating that tribes may submit comments to Defendants and those comments will be considered as part of the fee-to-trust application review process. 88 Fed. Reg. 86222, 86241.

64. Plaintiff FIGR is informed and believes, and on that basis alleges, that Koi Nation submitted a land into trust application to Defendants on September 15, 2021. Defendants notified FIGR by letter on or about April 2, 2024, of the Koi Nation's application and stated that any comments received within 30 days would be considered and made a part of Defendants' administrative record. The Tribe submitted comments on April 30, 2024, explaining that the land was located in FIGR's Southern Pomo homeland and outside of the Koi Nation's aboriginal area and that jurisdictional conflicts would arise if the land was taken into trust for the Koi Nation.

### D. The Environmental Impact Statement Process

65. In September 2023, BIA released an Environmental Assessment for the Project and requested public comment on this document. Since the Project constitutes a "major Federal action significantly affecting the quality of the human environment" pursuant to NEPA, BIA thereafter agreed to prepare an Environmental Impact Statement ("EIS") for the Project.

66. On July 8, 2024, after conducting scoping, BIA published a Notice of Availability of a Draft Environmental Impact Statement ("Draft EIS") for the Koi Nation's land into trust application for the Koi Nation Project. 89 Fed. Reg. 55968 (July 8, 2024). This notice started a public comment period that ended on August 26, 2024. The Tribe timely submitted two extensive comment letters, with supporting expert reports, addressing the factual, scientific and legal inadequacies in the Draft EIS, and many of its citizens also submitted public comments.

67. On November 22, 2024, Defendants publicly released the Final EIS for the Project. In the Notice of Availability for the Final EIS, Defendants requested comments on the Final EIS that they specified must be received by December 23, 2024. FIGR timely submitted, through counsel, extensive written comments on the Final EIS in a letter, enclosing expert reports, dated December 23, 2024.

68. On January 13, 2025, Defendants issued a ROD entitled "Trust Acquisition of 68.6

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

- 18 -

Acres in Sonoma County, California for the Koi Nation of Northern California" approving implementation of the Project and taking of the Shiloh Site into trust. The issuance of this ROD constitutes "final agency action" under NEPA.

### E.   Final EIS Inadequacies

69.   The Final EIS for the Project is notable for its many factual, scientific and legal inadequacies, omissions and analytical failures. In a premature rush to complete this document, Defendants cut corners, made only superficial changes to the inadequate Draft EIS, and attempted to explain away the many deficiencies in the document. However, no amount of minor tweaking and cosmetic changes can cover up the clear inadequacies in the Final EIS.

70.   In the Fifth and Sixth Claims for Relief, FIGR delineates the many deficiencies in the Final EIS. The Fifth Claim addresses the prominent deficiency in the Final EIS relating to Defendants' unjustified refusal to examine any off-site Project alternative, including any site within Lake County, where the Koi Nation's demonstrated ancestral territory is located. The Sixth Claim addresses the range of major deficiencies in the Final EIS analyses of cultural resources, wildfire risks, traffic, air quality, land use, wastewater discharges and other environmental impacts that, individually and cumulatively, result in the Final EIS failing to meet the "hard look" standard required by NEPA.

### FIRST CLAIM FOR RELIEF

### (Violation Of IGRA and APA – Arbitrary And Capricious Determination)

71.   Plaintiff FIGR realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 70 of this Complaint.

72.   IGRA bars Indian gaming on newly acquired lands unless one of a limited group of exceptions is met. These are often referred to as the "equal footing exceptions." The IGRA statutory exception that the Koi Nation applied for in this case authorizes Indian gaming when "lands are taken into trust as part of… (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). This is often termed the "restored lands exception."

73.   The restored lands exception was "not intended to give restored tribes an open-

- 19 -

ended license to game on newly acquired lands.  Rather, its purpose was to promote parity between established tribes, which had substantial land holdings at the time of IGRA's passage, and restored tribes, which did not."  *Redding Rancheria v. Jewell*, 776 F. 3d 706, 711 (9th Cir. 2015).  As DOI has recognized, the restored lands exception effectuates "IGRA's balancing of the gaming interest of newly acknowledged and/or restored tribes with the interests of nearby tribes and the surrounding communities."  79 Fed. Reg. 29367.

74.    As an alternative for situations where a proposed tribal gaming project does not otherwise satisfy an equal footing exception, IGRA provides the Secretarial two-part determination process, which allows a tribe to game on after-acquired lands if the governor of the state concurs with the Secretary's determination that taking the land into trust would be in the best interest of the tribe and not detrimental to the surrounding community.  25 U.S.C. § 2719(b)(1)(A).

75.    In 2008, DOI adopted new regulations which purport to interpret the requirements of IGRA.  25 C.F.R. Part 292.  Pursuant to Section 292.7, the regulations require a tribe to meet four conditions to qualify for gaming under the restored lands exception, including that "the newly acquired lands meet the criteria of 'restored lands' in § 292.11."  Section 292.11 interprets "restored lands" to mean at least one of three alternatives.  Defendants applied the second alternative to this Project, which requires that the tribe meet the requirements of Section 292.12.  25 C.F.R. § 292.11(b)(1).[3]

76.    Section 292.12 states that three criteria must be met to "establish a connection to the newly acquired lands": (1) the newly acquired lands must be within the tribe's state and must meet one of the tests for establishing a "modern connection[]"; (2) the tribe must "demonstrate a significant historical connection to the land"; and (3) the tribe must establish a "temporal connection" by meeting one of two alternative tests.

77.    Section 292.2 states: "Significant historical connection means the land is located

---

[3] In a March 29, 2024 letter, DOI waived the requirements in Sections 292.10(b) and 292.11(b) that require the Koi Nation to be administratively recognized through the Part 83 process to qualify as a restored tribe for the restored lands exception. DOI cited its broad authority under 25 C.F.R. § 1.2 to waive this regulatory requirement in the best interest of Indians.

Case No.    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

within the boundaries of the tribe's last reservation under a ratified or unratified treaty, *or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land*."  (emphasis added).

78.    In the January 13, 2025 Decision Letter, Defendants determined, supposedly using the Part 292 regulations, that the Koi Nation allegedly met all of the modern connection, significant historical connection, and temporal connection criteria for the proposed Project.  Specifically, Defendants purportedly found that (A) the modern connection is met because the land is located within 25 miles of the tribal headquarters and near where "a significant number of tribal members reside"; (B) the significant historical connection is met because of certain stated factors discussed below; and (C) the temporal connection is met because the tribe applied to take the land into trust within 25 years after the tribe was restored to Federal recognition.

79.    Defendants' Decision Letter determining that the Shiloh Site qualifies for the restored lands exception is arbitrary, capricious, and is not otherwise accordance with law.  DOI concluded that the Koi Nation showed a significant historical connection to the Shiloh Site through trade routes, occupancy, subsistence use, and burial grounds near the Shiloh Site.  The Decision Letter violates many established legal principles under IGRA's restored lands exception, is wholly unsupported by the facts, and contravenes dozens of findings set forth in similar decisions for other tribes over the last 25 years.  The major deficiencies will be identified below.

80.    At the outset, Defendants have acted unlawfully by failing to analyze and utilize an applicant tribe's ancestral territory as an important part of the restored lands analysis.  A tribe's aboriginal connection to the vicinity of the proposed gaming site is a critical component of a restored lands analysis, particularly with respect to the "significant historical connection" requirement in DOI's regulations, as recognized in federal court cases, DOI and NIGC precedent both before and after the 2008 adoption of the Part 292 regulations.  The importance of this aboriginal territory factor has been emphasized in multiple such determinations.  *See*, *e.g.*, *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney for the W. Dist. Of Michigan*, 198 F. Supp. 2d 920, 925 (2002) (the parcel being acquired was within "the heart of the region that comprised the core of the Band's aboriginal territory and was historically important to the

- 21 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

economy and culture of the Band"), *aff'd* 369 F.3d 960 (6th Cir. 2004).

81. Defendants also acted arbitrarily and capriciously by failing to take into account the large 50-mile distance between the proposed gaming parcel and the applicant tribe's historic rancheria, particularly for California tribes. There are at least 12 positive restored lands determinations for California tribes. In those not involving a tribal restoration act, the proposed gaming parcels were located adjacent to or only up to 15 miles from the historic rancheria. Even in the rarer situations involving a tribal restoration act which expressly delineated whole counties associated with the restored tribe, gaming parcels have only been approved for distances up to 26 miles from the historic rancheria.

82. In the Decision Letter, Defendants failed to appropriately consider evidence and comments submitted by FIGR, the Southern Pomo tribes of Sonoma County, and others opposing the Koi Nation's request for a restored lands determination. Despite FIGR's extensive and detailed comments submitted on January 31, November 22, and December 20, 2024, Defendants' only reference to FIGR's rebuttal evidence is in a single footnote stating that "several Tribes submitted letters" opposing Defendants taking the land into trust for the Koi Nation. Defendants' Decision Letter similarly dismisses the numerous opposition letters in a single sentence: "In response to the letters of opposition…, we note that there is no requirement that restored land be within a tribe's aboriginal area or that the tribe show it exclusively used the lands." This assertion ignores the extensive factual evidence submitted rebutting the Koi Nation's assertions and demonstrating the Koi Nation's lack of adequate evidence of a significant historical connection. It also sidesteps Defendants' reversal from prior precedent in applying the IGRA restored lands exception.

83. Contrary to IGRA and to Defendants' prior decisions regarding restored lands requests, Defendants determined that the existence of a trail network shared among Northern California tribes, not one created or controlled by the Koi Nation, supports finding a significant historical connection in favor of the Koi Nation. The trail network depicted in the Koi Nation's application touches upon the territory of dozens of interconnected tribal communities throughout Marin, Sonoma, Lake, and Mendocino Counties. There is no evidence that the Koi Nation occupied or used these trails beyond a transitory presence. In prior restored lands decisions,

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

- 22 -

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendants found that the mere passage through an area by tribal ancestors is insufficient to establish occupancy or subsistence use and has required more, such as tribal control of the trade route or the use of the route to connect a specific tribe's villages. Defendants acted arbitrarily and capriciously by ignoring prior precedent to find that the asserted use of shared trails by Koi Nation ancestors was sufficient to show occupancy and subsistence use.

84.     A significant historical connection under Section 292.2 requires evidence of the "*tribe's* villages, burial grounds, occupancy or subsistence use" (emphasis added), but Defendants have arbitrarily and capriciously conflated the 20th century presence of *individual* Koi Nation members with *tribal* occupancy and subsistence use. Defendants rely heavily on the relocation of Koi Nation member Tom Johnson to Sebastopol in 1918, where he was joined by other family members. However, FIGR submitted census evidence showing only 8 members of the Johnson family were in Sonoma County in 1920, while the vast majority of Koi Nation members still resided in Lake County. The Johnson family residence was never referred to as a tribal village or rancheria in contemporaneous federal records, but those records do refer to established Koi Nation communities and villages on Clear Lake. Defendants unlawfully concluded that the presence of a Koi Nation family in Sonoma County constituted a tribe's occupancy, despite prior restored lands determinations that rejected the presence of individual tribal members as equating to tribal occupancy or subsistence use.

85.     Defendants assert in the Decision Letter, contrary to the evidence, that Johnson's family residence functioned as a Koi Nation political headquarters. While Johnson certainly acted as a pan-Indian advocate, none of the documents submitted in support of the restored lands exception indicate that Johnson was an appointed Koi Nation leader or that the Koi Nation held tribal meetings there. Instead, other Koi Nation members were referred to as the Koi Nation's leadership during the relevant time. Additionally, the official vote by the Koi Nation to determine if it would organize as a tribe under the IRA was taken at the Lower Lake Rancheria near Clearlake in Lake County. There is little to no evidence supporting Defendants conclusion that the private residence of Johnson functioned as a Koi Nation political headquarters.

86.     Defendants also determined contrary to law that Koi Nation members' work as farm

- 23 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

laborers in the Russian River Valley and the Johnson family's operation of a commercial orchard establish a pattern of occupancy and subsistence-like use.  This conclusion, however, is not supported by the available evidence, which does not indicate that any Koi Nation ancestors were among the Indians forced into agricultural labor in the Russian River Valley. Instead, this conclusion must rely entirely on the commercial orchard of the Johnson family in the 20th century.

87.    Defendants unlawfully concluded that there are Koi Nation burial grounds near the Project Site. The evidence cited only demonstrates that individual Koi Nation members were buried in cemeteries in Lake, Sonoma, and Napa Counties in the 20th and 21st centuries. Defendants essentially determined that any cemetery where a Koi Nation member is buried is a *tribal* burial ground for purposes of establishing a significant historical connection, despite the fact that the evidence shows the date of death of the identified individuals was from the 1940s through 2007.

88.    In sum, Defendants have failed to correctly apply the law to the facts in making their rushed decision to approve the restored lands application here.  Defendants' decision is arbitrary, capricious, and an abuse of discretion for many reasons, including because Defendants "relied on factors which Congress had not intended it to consider" and "entirely failed to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Rather than constituting a legally compliant determination under IGRA, it is no more than a decision to approve prohibited "reservation shopping" that directly and adversely affects the interests of FIGR and similarly situated Sonoma County tribes.  For these reasons, FIGR requests that the Court hold these actions to be unlawful and set them aside as required by APA Sections 706(2)(A), (C) and (D).

89.    Plaintiff is entitled to a declaratory judgment by the Court in which it determines the rights and duties of the parties with respect to the restored lands decision pursuant to 28 U.S.C. §§ 2201-2202, including that the restored lands decision violated IGRA.

90.    Plaintiff FIGR is entitled to temporary, preliminary and permanent injunctive relief to prevent harm from occurring by reason of this violation of IGRA.

WHEREFORE, Plaintiff FIGR seeks relief as set forth in the Prayer.

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

- 24 -

Case No.    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## SECOND CLAIM FOR RELIEF

### (Violation Of IGRA and APA – Invalid Regulations)

91.     Plaintiff FIGR realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 90 of this Complaint.

92.     Section 706 of the APA provides that "[t]o the extent necessary to [a] decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. It also directs that courts "hold unlawful and set aside agency action, findings, and conclusions found to be… not in accordance with law." *Id.* § 706(2)(A).

93.     In the case of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2004), the U.S. Supreme Court stated that "[t]he text of the APA means what it says," including that "[t]he APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." *Id*. at 393-94. In *Loper Bright*, the Court directly overruled the doctrine of *Chevron* deference to administrative agency interpretations and mandated that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id*. at 412. Moreover, the Court emphasized that "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id*. at 413.

94.     Plaintiff FIGR believes that Section 2719 of IGRA is unambiguous and that, using the statute alone, in the context of its interpretive case law, compels a determination that the Koi Nation's request for a "restored lands" determination for the Shiloh Site in its favor must be denied, and Defendants' determination to the contrary must be vacated.

95.     To the extent the Court here determines that the restored lands exception contained in IGRA is ambiguous, the Court must utilize its independent judgment in deciding what IGRA Section 2719 means and should not defer to DOI's interpretation of IGRA set forth in the 2008 regulations contained in Part 292. In particular, to the extent that DOI has reinterpreted the "significant historical connection" requirement of the Part 292 regulations in reaching its restored

- 25 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

lands decision here, that reinterpretation should also not be given any deference.

96.    The Section 292 regulations, as interpreted and applied by Defendants to determine whether the tribal applicant here meets the "restored lands exception" in IGRA, are fatally inconsistent with the IGRA and its interpretive case law.  Accordingly, FIGR requests that the Court invalidate these regulations for exceeding the statutory authority of Defendants to adopt and utilize these regulations under APA Section 706.  Under the Supreme Court's decision in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799 (2024), the statute of limitations for an APA challenge to regulations accrues when a plaintiff is injured by final agency action and extends six years thereafter pursuant to 28 U.S.C. § 2401(a).  In this case, FIGR was injured by the Decision Letter and ROD upon their issuance on January 13, 2025.  Accordingly, this legal challenge to the regulations is timely.

WHEREFORE, Plaintiff FIGR seeks relief as set forth in the Prayer.

### THIRD CLAIM FOR RELIEF

### (Violation of IRA and APA -- Tribal Privileges And Immunities)

97.    Plaintiff FIGR realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 96 of this Complaint.

98.    IRA grants federally recognized tribes the same privileges and immunities enjoyed by any other tribe:

> Departments or agencies of the United States shall not promulgate any regulation or make an decision or determination pursuant to the Act of June 18, 1934 [IRA] as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. § 5123(f).

99.    Defendants' decisions and determinations contained in the ROD and the Decision Letter were made by federal departments and agencies under the IRA and other Acts of Congress that are subject to this tribal privilege and immunity protection.  If this statutory protection is violated, it constitutes a federal agency action not in accordance with law under APA Section 706(2)(A).

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

Case No.                          COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

100.    In adopting and issuing the Decision Letter and ROD for the Project, Defendants reinterpreted the restored lands exception under its Part 292 regulation in a manner that diminishes the privileges available to FIGR and other tribes who have recently gone through the "restored lands exception" process and thereby artificially enhanced and conferred greater privileges to Koi Nation than has been given to similarly situated tribes.  In particular, Defendants granted Koi Nation rights to operate gaming outside of its homeland in a way that benefited Koi Nation unfairly relative to other restored tribes, including FIGR.

101.    Defendants also improperly applied the Indian canon of construction, which requires ambiguous language in statutes purporting to benefit Indians to be interpreted liberally in favor of the Indians, in approving the land into trust application here.  This application of the Indian canon was incorrect and violates the privileges and immunities clause because the Indian canon of construction does not apply when tribes are present on both sides of a determination.  *See, e.g., Redding Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015) (in evaluating restored lands exception, the court found that the Indian canon did not apply "because all tribal interests are not aligned").  Moreover, Defendants improperly applied the Indian canon to factual determinations in the Decision Letter, thereby diminishing the privileges given to similarly situated tribes like FIGR.

102.    Defendants' new reinterpretation of the restored lands exception and their incorrect application of the Indian canon of construction in the Decision Letter and ROD each violate the tribal anti-discrimination protections in Section 5123(f) and therefore constitute agency decisions and determinations that are not in accordance with law.  As a result, the Decision Letter and ROD decisions and determinations are unlawful and must be set aside and vacated by the Court.

WHEREFORE, Plaintiff FIGR seeks relief as set forth in the Prayer.

### FOURTH CLAIM FOR RELIEF

**(Violations Of IRA and APA -- Arbitrary And Capricious Determination)**

103.    Plaintiff FIGR realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 102 of this Complaint.

104.    Defendants made their land into trust decision for the proposed Koi Project under

- 27 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

the IRA.  They also purported to apply the prior version of their fee-into-trust regulations at 25 C.F.R. Part 151 because the updated Part 151 regulations went into effect in January 2024 after the tribal applicant submitted its application.  Former 25 C.F.R. § 151.11(b) provides: "The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition.  The Secretary shall give greater weight to the concerns raised pursuant to [paragraph (d) of this section]."  Paragraph (d) prescribes that greater weight must be given in this circumstance to the concerns raised by state and local governments regarding potential impacts on regulatory jurisdiction.

105.    It was arbitrary, capricious and an abuse of discretion for Defendants to approve this transaction under IRA without giving greater scrutiny to the Koi Nation's justification of anticipated benefits of the acquisition as required by Defendants' own regulations.  Moreover, Defendants should have given greater (or, in some cases, any) consideration to the concerns raised by the affected state and local governments.  As demonstrated by the comment letters received in connection with the Final EIS, all of the significant local government agencies, including the County of Sonoma and the Town of Windsor, along with the Governor of California and multiple members of Congress for this area, strongly opposed the siting of this Project on the Shiloh Site.  Moreover, although required to do so by DOI policy, regulations, and administrative law, Defendants either ignored or gave little consideration for the concerns of FIGR and other tribes to which Defendants also owe a fiduciary duty.

106.    Under former 25 C.F.R. § 151.10(f), Defendants are also required to take into account jurisdictional problems and potential conflicts of land use that may arise from the trust acquisition.  DOI concluded that such impacts would not occur.  This conclusion is arbitrary, capricious, an abuse of discretion and contrary to legal requirements because there is substantial evidence in the administrative record that there are both serious land use conflicts and concomitant jurisdictional issues with state and local governments that are expected to occur, and Defendants' analysis under the regulatory criteria was specious at best.

- 28 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

107. Defendants have failed to comply with the law or correctly apply the law to the facts in deciding to approve the land into trust acquisition as they made their rushed and premature decision to accept the land into trust and approve the restored lands application here. For these reasons, FIGR requests that the Court hold these actions to be unlawful and set them aside as required by APA Section 706(2)(A), (C) and (D).

108. Plaintiff is entitled to a declaratory judgment by the Court in which it determines the rights and duties of the parties with respect to the land into trust decision pursuant to 28 U.S.C. §§ 2201-2202.

109. Plaintiff FIGR is entitled to temporary, preliminary and permanent injunctive relief to prevent harm from occurring by reason of these violations of the IRA.

WHEREFORE, Plaintiff FIGR seeks relief as set forth in the Prayer.

**FIFTH CLAIM FOR RELIEF**

**(Violations Of NEPA and APA – Failure To Consider A Reasonable Range Of Alternatives)**

110. Plaintiff FIGR realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 109 of this Complaint.

111. Section 2 of the Final EIS evaluated only four Project alternatives: (1) the proposed Project, (2) a reduced size resort/casino project, (3) a hotel/spa/winery project, and (4) the "No Action" alternative. Critically, all three of the development alternatives only constitute projects that would be constructed and operated on the Project Site. Conspicuously missing is any off-site alternative, and in particular, any alternative that would be constructed in Lake County where the Koi Nation's ancestral homeland is located.

112. The early scoping reports on which the Final EIS relies eliminated all off-site alternatives at the outset on the basis of faulty selection criteria that are not factually or legally sufficient. Rather, this blanket rejection of all off-site alternatives constitutes prohibited applicant control over the selection of alternatives. *See*, *e.g.*, *National Parks & Conservation Ass'n v. BLM*, 586 F.3d 735, 747-48 (9th Cir. 2009) (court invalidates Final EIS because the BLM alternatives were too narrowly drawn to make sure that the applicant's "private needs be met").

Case No.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

113. DOI's NEPA regulations emphasize that the lodestar for the selection of alternatives is the agency's purpose and need: "It is the bureau's purpose and need for action that will determine the range of alternatives and provide a basis for the selection of an alternative in a decision." 43 C.F.R. § 46.420(a)(2). Moreover, these regulations emphasize that the complete range of alternatives must be vigorously evaluated: "… a reasonable number of examples covering the *full spectrum* of reasonable alternatives, *each of which must be rigorously explored and objectively evaluated*, …." 43 C.F.R. § 46.420(c) (emphasis added).

114. An off-site alternative here could and would meet the "purpose and need" for this proposed action. Here, the "purpose" of the proposed action "is to facilitate tribal self-sufficiency, self-determination, and economic development." Final EIS, Section 1.2. The "need" is for the Department to act in conformance with its governing Section 151 regulations. *Id*. Thus, neither the purpose nor need are limited to evaluating only the one particular site in FIGR's ancestral territory proposed by the Koi Nation. Rather, the general purpose (and accompanying need) of facilitating tribal self-sufficiency, self-determination and economic development can be accomplished in many geographic locations. The Final EIS does not assert otherwise.

115. Since the Final EIS purpose has been defined broadly and is not specific in locational terms, a location within Lake County could well fulfill these requirements. Defendants are mandated to "rigorously explore" the "full spectrum" of reasonable alternatives that achieve this broad purpose and need. By refusing to consider a development proposal on any site other than the one selected by the Koi Nation, the Final EIS fails to fulfill its role and Defendants have failed to satisfy NEPA.

116. The Final EIS asserts, in contravention of both the facts and law, that no other location is economically or technically feasible, essentially because another site is not currently owned by the Koi Nation. However, the Koi Nation and its out-of-state financial backers have the demonstrated ability to buy large sites and several eligible sites are available in Lake County. This major omission constitutes a patent failure to evaluate a reasonable range of alternatives as required by NEPA.

117. In Appendix P to the Final EIS, Defendants stated for the first time that these

- 30 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

alternative sites were rejected based on *undisclosed* criteria in addition to the articulated alternative screening criteria.  However, these new undisclosed criteria are clearly only designed to exclude any site outside of Sonoma County.  First, it is immaterial that certain Koi Nation members did not like living in the Lake County rancheria that the tribe originally acquired.  FIGR never commented that this Project needed to be sited on this property.  Rather, FIGR stated that an alternative site for the Project within the tribe's greater ancestral homeland area in Lake County should have been carefully evaluated.  Second, the new "criteria" that a Project site must be within 25 miles of its current headquarters is invalid because it ignores the ancestral homeland and would improperly motivate tribes to move their headquarters to attempt to "reservation shop" in new locations.  Third, the newly announced criteria that the Project must be within Sonoma County is transparently (and illegally) designed only to eliminate sites in Lake County.

118.    Defendants routinely include off-site project alternatives in NEPA documents for Indian gaming proposals.  *See, e.g.*, 2016 Wilton Rancheria Final EIS, Section 2 – Alternatives (Dec. 2016) (considering, among the alternatives, the tribe's historic rancheria site which was no longer held in trust); DOI, Record of Decision for Trust Acquisition of the 40-acre Yuba County Site in Yuba County, California, for the Enterprise Rancheria of Maidu Indians of California (Nov. 2023) (incorporating the Final EIS and considering, among the alternatives, the tribe's historic rancheria site which was held in trust for the tribe); BIA, Final Environmental Impact Statement, North Fork Rancheria of Mono Indians (Feb. 2009) (considering, among the alternatives, the tribe's historic rancheria site which was held in trust for individual North Fork members).

119.    The failure to consider a reasonable range of alternatives is a fatal flaw in a Final EIS because it prevents an agency from comparing alternatives across all of the environmental parameters addressed in the document.  This is particularly true in this case because certain of the major environmental impacts of the Project – including wildfire, cultural resource, traffic and land use impacts – would likely be much less significant in a Lake County area within the Koi Nation's homeland. *See, e.g.*, *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006) (court found that the Army's after-the-fact attempt to geographically limit the alternatives for the proposed action to Hawaii was invalid because it did not conform to the purpose and need

- 31 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

statement and illegally limited the scope of reasonable alternatives).

120.　Defendants' failure to examine a reasonable range of alternatives to the Shiloh Site is arbitrary, capricious and an abuse of discretion, is otherwise not in accordance with law, and in excess of statutory authority.  For these reasons, the Court should determine that these actions are unlawful and set them aside as required by APA Sections 706(2)(A), (C) and (D).

121.　Plaintiff is entitled to a declaratory judgment by the Court in which it determines the rights and duties of Plaintiff FIGR and Defendants with respect to the inadequacy of alternatives in the Final EIS for the Koi Nation Project application for a land into trust transaction pursuant to 28 U.S.C. §§ 2201-2202.

122.　Plaintiff FIGR is also entitled to temporary, preliminary and permanent injunctive relief to prevent irreparable harm from occurring due to these NEPA violations.

WHEREFORE, Plaintiff seeks relief as set forth in the Prayer.

## SIXTH CLAIM FOR RELIEF

### (Violations Of NEPA and APA – Failure To Take A "Hard Look" At Project Effects)

123.　Plaintiff FIGR realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 122 of this Complaint.

124.　NEPA required Defendants to take a "hard look" at the environmental consequences of the Koi Project before taking final action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  To meet this requirement, an EIS must rely on the most up-to-date data, consider all foreseeable direct and indirect impacts, and not rest conclusions upon unsupported and/or irrational assumptions.  *See*, *e.g.*, *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085-87 (9th Cir. 2011); *Northern Alaska Environmental. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006); *City of Los Angeles v. Fed. Aviation Adm'n*, 63 F.4th 835 (9th Cir. 2023).  It is clear from the Final EIS that the BIA did not take a "hard look" as required under NEPA.

**Cultural Resource Impacts**

125.　The Shiloh Site contains sacred cultural resources, likely including ancestral remains, of FIGR and other Southern Pomo tribes.  In preparing the cultural resources section of

- 32 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

the Final EIS, Defendants failed to follow NHPA requirements, which resulted in a series of flawed studies and massive failures to properly consult FIGR. These widespread failures led to the woefully inadequate and not credible conclusion in this section of the Final EIS that Project impacts to cultural resources will be "less than significant" due to the implementation of mitigation. This conclusion is flawed at the outset because of Defendants' failures to follow the required NHPA process.

126. The Final EIS mitigation measures that supposedly make the Project impacts to cultural resources "less than significant" are completely ineffective and insufficient. Each mitigation measure is primarily oriented around data recovery, not avoidance of impacts. Data recovery, by its very nature, does not avoid impacts to historic sites. Instead, it is designed to try to preserve information about the impacted resources before they are lost or destroyed. Data recovery is not adequate mitigation in the context of impacts to tribal cultural resource rights and sovereignty. Defendants refused to engage in the legally required consultations regarding the Project impacts and potential mitigation measures. Among other deficiencies, the adopted mitigation measures do not require FIGR involvement in the establishment of an archaeological monitoring program and Archaeological Design and Treatment Plan. The mitigation measures also improperly prioritize consultation with the Koi Nation, even though the Koi Nation has no cultural affiliation with the Shiloh Site for the Project.

**Clear and Present Wildfire Risks**

127. The immediate area where the Shiloh Site is located has recently experienced two major fires: the Tubbs Fire in 2017 (the fourth largest fire in California history) and the Kincade Fire in 2019. Both fires triggered large-scale evacuations and demonstrated that this is a wildfire prone area. The Final EIS determines, contrary to all evidence, that wildfire hazards are not a significant risk at the Shiloh Site. This implausible conclusion is buried in a "Hazardous Materials and Hazards" section and is based on implementation of a couple of mitigation measures that FIGR's wildfire experts have determined are totally ineffective. Remarkably, the Final EIS even fails to include an emergency evacuation plan. Expert evidence in the record establishes that the Shiloh Site is tremendously vulnerable to future wildfires, and the Final EIS's cursory analysis of

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

- 33 -

these potential impact and its identified mitigation measures are simplistic, incomplete and wholly inadequate.

128.    Despite acknowledging that the Koi Project is in a designated high fire risk area and conceding that the construction of the Koi Project could increase the risks of wildfires, the BIA erroneously concluded that wildfire hazards and impacts are not significant without providing a meaningful analysis of the direct, indirect, and cumulative effects of the Project's construction and operation on wildfire risks as required under NEPA.  Under NEPA, conclusory statements as to the effectiveness of BMPs are not sufficient.  *See*, *e.g.*, *Wilderness Soc'y v. Bosworth*, 118 F. Supp. 2d 1082 (D. Mont. 2000).

**Wholly Inadequate Transportation/Traffic Studies**

129.    The Final EIS claims that the traffic impacts of the Project will be less than significant based almost completely on a traffic study that relies on flawed data to analyze trip generation, intersections, street segments and potential mitigation.  FIGR engaged an experienced traffic engineering firm to peer review this study and FIGR provided this expert report to Defendants with its Draft EIS comments.  These experts concluded that the traffic study is wholly inadequate.  In particular, they determined that the trip generation analysis is "fatally flawed" because it calculates the number of employee and visitor trips for the Project to be only 11,000 per weekday, when in fact using accepted industry standards, the actual number should be over 29,000 trips per weekday, which is almost *triple* the number of trips.  This huge error is compounded by other study problems, including that the study area was inadequate, the actual number of impacted intersection and street segments cannot be determined, and the level of proposed mitigation is insufficient.  The peer review concludes that "there is no empirical basis to support a conclusion that the Project transportation impacts will be less than significant, with or without mitigation."

130.    The Final EIS's reliance on this flawed traffic study resulted in a severe underreporting of the number of trips that will be added to the street system (approximately 11,000 daily trips versus the more accurate 29,000 daily trips).  This underreporting results in transportation impacts not being properly disclosed, significance determinations not being based on the correct data, and the overall transportation conclusions being unsupported by the data.  In

- 34 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

addition, among other deficiencies, the study does not analyze intersections and roadways which will be impacted by project traffic and fails to accurately calculate trip rates for events, thereby greatly understating traffic during events. These fatal data and analytical problems prevent the traffic calculations from serving as the basis for any conclusions regarding traffic and associated impacts.

131. The Final EIS's trip generation errors and other miscalculations also completely undermine all of the associated environmental impact calculations and conclusions in the associated environmental areas of air quality, noise, land use and public service relied on these dramatically incorrect traffic assumptions and greatly understate the actual individual and cumulative environmental impacts in these areas. Moreover, these errors also invalidate the Federated General Conformity Determination for air quality impacts.

**Evacuation Impacts**

132. The deficient wildfire risk analysis and traffic study also combine to form an inadequate basis for a credible evacuation analysis if a fast-moving wildfire or other emergency occurs. Moreover, although the Final EIS concedes that with the Project the evacuation time could increase to six to eight hours, it nevertheless concludes that the Project would not significantly inhibit local emergency response to or evacuation from wildfire or conflict with a local wildfire management plan. This conclusion was not based on a comprehensive wildfire risk analysis; rather, it was based on a faulty Evacuation Travel Time Assessment ("ETTA"). Alarmingly, the ETTA showed no actual field measurements of traffic nature or volumes keyed to the road segments and intersections that would be involved in an evacuation process. The evacuation time requirements appeared to be based entirely on published information inputted into a routine traffic model. Additionally, the ETTA lacked an *in situ* analysis that would establish baseline conditions for the roadway/intersection system and a wildfire evacuation scenario comprised of comparative traffic models for typical baseline traffic and modeling for the added traffic during a wildfire-related evacuation.

**Air Quality and Noise Impacts**

133. Besides fatally undermining the traffic impact calculations, the addition of over

- 35 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

18,000 daily vehicle trips more than the Final EIS recognized will cause significant unreported air quality impacts because the majority of air quality impacts from the Project are a result of mobile emissions from vehicle trips.

134.    Because the traffic estimates that underlie the noise section of the Final EIS are fatally flawed, the determination that these impacts are "less than significant" (with or without mitigation) is invalid.

**Major Land Use Conflicts**

135.    The Project would be built in the midst of quiet residential neighborhoods near schools, a church and vineyards.  The Shiloh Site is located in unincorporated Sonoma County and is zoned for agriculture.  It is part of the County's "Community Separator" areas, which are "voter-approved districts that were created to preserve open space, retain rural visual character, limit new development in scale and intensity, and specifically avoid commercial development."  Under these land use restrictions, the Project would be prohibited in this location.

136.    By putting the Shiloh Site in federal trust status, Defendants can evade these local land use restrictions which are legally (but not environmentally) inapplicable to federal lands.  The Final EIS mistakenly concludes that land use impacts will not be significant because it falsely equates the elimination of local/state land use restrictions when it becomes federal trust land with the elimination of actual land use impacts.  In so doing, the Final EIS improperly fails to identify and address the fact that this Project threatens to destroy the residential neighborhood and agricultural character of this area and undermine the County's thoughtful land use decisions over decades.

**Water/Wastewater Issues**

137.    The Shiloh Site lacks any municipal water or sewage system services.  This is a major issue because, at peak times, the Project will have 10,000 or more people on site, which is the size of a small city.  As a result, the Project proposes to construct and operate new water wells, a water treatment plant, water storage facilities, an extensive wastewater treatment plant, large wastewater storage tanks and storage ponds, and a complicated network of pipelines.  All of these facilities will supposedly (but not realistically) be jammed into a 3.5 acre area.

- 36 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

138.     Most significantly, the Project proposes to discharge tens of millions of gallons of wastewater each year into Pruitt Creek (an intermittent waterway used by endangered salmonids), but will not be allowed to do so from May through October each year.  Instead, this wastewater would be put in large ponds on site and/or in tall (up to 45 feet) storage tanks.  The Final EIS is inadequate because it never presents or specifically analyzes exactly where these various wastewater facilities will be located or how they will be operated in a manner protecting the creek and its extremely sensitive salmonid species.

**Socioeconomic Conditions and Environmental Justice**

139.     The environmental justice and socioeconomic impacts of the Project have not been properly identified, analyzed or assessed for "significance" in the Final EIS for all of the reasons set forth in FIGR's Draft and Final EIS comments and accompanying expert reports.  The  Final EIS mistakenly asserts: "There are no tribal communities in proximity to the Project Site, and [the Project] would have no potential to cause environmental burdens that may create economic disadvantages for tribal communities."  This finding fails to appreciate that the loss or destruction of FIGR cultural resources and ancestral remains on the Shiloh Site would have far-reaching cultural, economic and social impacts.  Moreover, by refusing to evaluate any resort/casino Project alternative that would be located within the Koi Nation's ancestral territory in Lake County, Defendants have failed to evaluate mitigation measures and alternatives that would address these severe impacts.

140.     The Final EIS analyses of adverse Project economic impacts on FIGR is also wholly deficient.  Although the EIS concludes that revenues at existing Sonoma County casinos, including FIGR, would decrease substantially due to the Project, it erroneously determines that such impacts are not significant.  Defendants fail to take into account that this decrease in business revenues has a direct effect on the funds upon which tribal governments depend to provide governmental services to their citizens, including public safety, environmental and cultural resources protection, health care, and other matters that affect the human environment of the affected tribal communities.  Moreover, because the funds transferred to tribal governments are a share of net revenues, the percentage decreases in gross revenues projected by the Final EIS translate necessarily into larger

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA  94105-2496

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

percentage decreases in funds to support the tribal governments and tribal citizens. The studies and reports which Defendants rely on for their calculations and conclusions in these subject areas are riddled with incorrect facts, deficient analyses, erroneous assumptions and unreliable calculations, all of which render this section legally deficient under NEPA.

**Biological Resources Impacts**

141. The Final EIS asserts that direct impacts to Pruitt Creek and its associated riparian corridor and the endangered species known to be present, would be reduced to less than significant levels with adherence to the conditions of applicable permits and implementation of Best Management Practices ("BMPs") and mitigation measures. However, the Final EIS does not provide enough information to make an adequate assessment of the Project's impact on Pruitt Creek and the riparian corridor. Not only that, the mere fact that a future permit is required does not obviate the BIA's obligations to prepare a complete analysis and disclosure of foreseeable environmental impacts. *See 350 Montana v. Haaland*, 50 F.4th 1254, 1272 (9th Cir. 2022); *Killgore v. SpecPro Professional Servs., LLC*, 51 F.4th 973, 989-90 (9th Cir. 2022); *S. Fork Band Council of Western Shoshone*, 588 F.3d 718, 726 (9th Cir. 2009) ("A non-NEPA document… cannot satisfy a federal agency's obligations under NEPA"); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998 (9th Cir. 2004).

**Public Services and Utilities**

142. To date, no concrete service agreement has been reached between PG&E and Koi Nation to actually service the Project once it is operational. Thus, the Final EIS assumption that PG&E will serve the Project underlying its impact analysis is based on pure speculation. Reliance on mere speculation and faulty assumptions is not sufficient to meet the "hard look" requirement under NEPA. *See*, *e.g.*, *City of Los Angeles v. Fed. Aviation Adm'n*, 63 F.4th 835 (9th Cir. 2023).

143. The Final EIS also fails to discuss what would happen if Koi Nation does not come to an agreement with PG&E. The uncertainty of the Project and its effects on the ability to conduct an adequate analysis of the impact of the project on public services and utilities is further highlighted by BIA's admission that "the exact extent of infrastructure development needed to serve the selected alternative will be determined at a later date, once infrastructure improvements

- 38 -

Case No.                    COMPLAINT FOR DECLARATORY AND INJUNCTIVE
                                                  RELIEF

needed are finalized between the [Koi] Tribe and PG&E." Under NEPA, the Draft EIS may not defer the analysis of foreseeable impacts that arise from a plan by arguing that their consequences are unclear or that they will be analyzed later when a site-specific program is proposed that implements the plan. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002).

144.    The Final EIS admits that "it is anticipated that the increased concentration of people due to [the Project] would lead to an increase in the number of service calls to local law enforcement." The Final EIS also acknowledges that construction and operation of the Project would increase demand for fire protection and emergency services. Despite these recognized risks, the Final EIS concludes that the impact on these public services will be "less than significant." The Final EIS claims that a handful of proposed mitigation measures and BMPs will alleviate any adverse impacts caused by the Project. Such mitigation measures include Koi Nation entering into future service agreements with Sonoma County Sheriff's Office and Sonoma County Fire District. However, the mere fact that a hypothetical service agreement may at some future time be in place does not mean that the increased demand for SCSO and SCFD services will not negatively impact these services.

**Cumulative Environmental Effects**

145.    One critical section of every Final EIS is the evaluation of the cumulative effects of the proposed action. The CEQ regulations define cumulative effects as effects "on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." 40 C.F.R. § 1508.1(i)(3). For several environmental sections, no analysis of cumulative impacts is even conducted. For other areas, the analysis is superficial, perfunctory and inadequate. The serious and extensive deficiencies in all of the environmental subject areas identified above have collectively resulted in a Final EIS that fails to identify, analyze or reach a credible "significant impact" conclusion for cumulative environmental effects. As a result, the cumulative impact section is completely inadequate and does not constitute a hard look at these important impacts.

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

- 39 -

Case No.    COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

**SEVENTH CLAIM FOR RELIEF**

**(Violations Of IGRA, IRA, NEPA and APA – Unlawful Delegation Of Authority)**

146.    Plaintiff FIGR realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 145 of this Complaint.

147.    Delegations of authority within DOI are governed by the Departmental Manual ("DM").  The Secretary has broad power to delegate, including a temporary delegation by Secretarial Order. 200 DM 1; 012 DM 1.  Authority over Indian Affairs has been delegated to the Assistant Secretary-Indian Affairs ("AS-IA") under 209 DM 8.1. The AS-IA in turn has authority to redelegate authority, but only through a DM release. 200 DM 8.3.

148.    The Principal Deputy AS-IA ("PDAS") has the authority of the AS-IA over matters for which the AS-IA is recused and the PDAS may redelegate his authority.  110 DM 8.2; 209 DM 8.4.  The PDAS is delegated authority over the BIA, Bureau of Indian Education, and programs of the Deputy Assistant Secretary-Policy and Economic Development (DAS-PED), among others. 110 DM 8.2.  The DAS-PED oversees Indian gaming issues, including the Office of Indian Gaming, but not the Bureau of Indian Education.  110 DM 8.4. The DM further delegates PDAS authority to the BIA and Bureau of Indian Education Directors for programs under their respective authority, but any redelegation of those authorities requires a DM release. 230 DM 1.2, 1.4. The Bureau of Indian Education plays no role in evaluating whether lands are eligible for gaming under IGRA.

149.    Plaintiff is informed and believes, and on that basis alleges, that AS-IA Bryan Newland was recused from the Koi decision, so his authority automatically passed to PDAS Wizipan Garriott. 110 DM 8.2.  Plaintiff further alleges, on information and belief, that PDAS Garriott left DOI on January 10, 2025 and that DAS-PED Kathryn Isom-Clause was acting PDAS when the Koi Project was approved on January 13, 2025, but she was also recused from the Koi decision.

150.    The Federal Register notice for the ROD and Decision Letter states that the notice is published pursuant to authority delegated by the AS-IA under 209 DM 8.1, but it does not specify the delegation of authority to the signatory for the actual decision. The ROD and Decision

- 40 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

Letter dated January 13, 2025 are signed by Bureau of Indian Education Director Tony Dearman. Plaintiff FIGR has not been able to locate any delegation to Director Dearman.

151.   Plaintiff FIGR is informed and believes, and on that basis alleges, that Bureau of Indian Education Director Dearman did not receive a valid and timely delegation of authority pursuant to a DM release to sign the ROD or the Decision Letter under NEPA, IGRA and IRA, and that these documents and the land into trust decision and conveyance are therefore invalid, null, and void *ab initio*.

WHEREFORE, Plaintiff FIGR seeks relief as set forth in the Prayer.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Federated Tribes of Graton Rancheria respectfully requests that the Court enter judgment in its favor as follows:

1.   On the First Claim for Relief:

(A)   That the Court enter a declaratory judgment that Defendants violated IGRA and the APA by determining that the Shiloh Site meets the "restored lands exception" in IGRA; and

(B)   That the Court set aside and vacate the ROD and Decision Letter.

2.   On the Second Claim for Relief:

(A)   That the Court enter a declaratory judgment that Defendants violated IGRA and the APA by their reinterpretation of the Part 292 regulations relating to application of the "restored lands exception" in IGRA;

(B)   That the Court set aside and vacate the ROD and Decision Letter; and

(C)   That the Court invalidate the Part 292 Regulations relating to Defendants' interpretation and application of the "restored lands exception."

3.   On the Third Claim for Relief:

(A)   That the Court enter a declaratory judgment that Defendants violated the Tribal Privileges and Immunities clause in IRA and the APA; and

(B)   That the Court set aside and vacate the ROD and Decision Letter.

4.   On the Fourth Claim for Relief:

Case No.                COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

(A)    That the Court enter a declaratory judgment that Defendants violated IRA and the APA by determining that the Koi Nation and the Project meet all of the necessary requirements for a land into trust transaction; and

(B)    That the Court set aside and vacate the ROD and Decision Letter.

5.    On the Fifth Claim for Relief:

(A)    That the Court enter a declaratory judgment that Defendants violated NEPA by failing to examine a reasonable range of alternatives in the Final EIS because they failed to evaluate any off-site alternative including any alternative in the historic homeland of the Koi Nation;

(B)    That the Court set aside and vacate the Final EIS, ROD and Decision Letter; and

(C)    That the Court direct Defendants to prepare a new EIS or prepare a revised EIS for the Project that conforms with the Court's NEPA determinations before proceeding with the Project.

6.    On the Sixth Claim for Relief:

(A)    That the Court enter a declaratory judgment that Defendants violated NEPA by failing to take a hard look at a wide range of important adverse environmental effects of the Project;

(B)    That the Court set aside and vacate the Final EIS, ROD and Decision Letter; and

(C)    That the Court direct Defendants to prepare a new EIS or prepare a revised EIS for the Project that conforms with the Court's NEPA determinations before proceeding with the Project.

7.    On the Seventh Claim for Relief:

(A)    That the Court enter a declaratory judgment that Defendants violated IGRA, IRA, NEPA and the APA by failing to have an authorized signatory, with a valid delegation of authority, execute the ROD and Decision Letter; and

(B)    That the Court set aside and vacate the ROD and Decision Letter as invalid,

- 42 -

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

null, and void *ab initio*.

8.    On all Claims for Relief:

(A)    That the Court enter a declaratory judgment that the ROD, Decision Letter and Final EIS are invalid, null, and void *ab initio* and consequently that the land into trust transaction has never been effectuated;

(B)    That the Court, in the alternative to 8(A), order Defendants to immediately reverse the land into trust transaction and reconvey the Shiloh Site back to the tribal applicant until such time, if any, that Defendants fully comply with IGRA, IRA and NEPA;

(C)    That the Court grant Plaintiff temporary restraining orders and preliminary and permanent injunctions;

(D)    That the Court award Plaintiff its attorneys' fees, expert witness fees, and other costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

(E)    That the Court retain jurisdiction of this action to ensure compliance with its declaratory, injunctive and other relief; and

(F)    That the Court award Plaintiff FIGR such further and other relief as the Court may deem appropriate or necessary.

Dated:  February 14, 2025                    SHARTSIS FRIESE LLP

                                                            */s/ Paul P. Spaulding, III*
                                                    By:    Paul P. ("Skip") Spaulding, III

                                                    Attorneys for Plaintiff
                                                    FEDERATED INDIANS OF GRATON
                                                    RANCHERIA

10575134

SHARTSIS FRIESE LLP
425 MARKET STREET
ELEVENTH FLOOR
SAN FRANCISCO, CA 94105-2496

- 43 -

Case No.                    COMPLAINT FOR DECLARATORY AND INJUNCTIVE
                            RELIEF